IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEIZURE OF THE EQUIVALENT AMOUNT OF USDT TOKENS AS ASSOCIATED WITH CRYPTOCURRENCY WALLET ADDRESS TPSBjNALXvg7S47VNP4Pp9JkuqDABb2BDT: | 1:26-sw-643<br>**UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEIZURE WARRANT

I, Ronald E. Miller, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a seizure warrant. I have been employed as a special agent with the Federal Bureau of Investigation ("FBI") since 2001. I am currently assigned to the FBI's Washington Field Office's Cyber Enabled-Fraud, Digital Asset & Security squad, which has investigative responsibility for transnational crimes to include fraudulent call centers targeting citizens of the United States. I have also previously been assigned to the FBI's Minneapolis Field Office and to the FBI Headquarters' Criminal Investigative Division. I have worked on squads that focus on the investigation of white–collar crimes (securities fraud, investment fraud, bankruptcy fraud, public corruption, and various financial scams) and Indian country crimes (death investigations, rapes, sexual and physical assaults, crimes against children, drug crimes, arson, and financial crimes). I have a Bachelor's Degree in accounting and a Master's Degree in Business Administration. During my career as an FBI special agent, I have conducted

over 200 cases as the lead investigator. Prior to joining the FBI, I was employed as an accountant for a Fortune 500 company. Through my employment with the FBI, I have gained knowledge in the use of various investigative techniques including the utilization of physical surveillance, investigative interviews, financial investigations, and the execution of search and arrest warrants.

2. As a federal agent, I am authorized to investigate violations of laws of the United States. As a law enforcement officer, I am authorized to execute warrants issued under the authority of the United States. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

3. As further described below, I make this affidavit in support of an application for a seizure warrant for funds traceable to, and involved in, a fraud scheme that deceived the victim into providing the seed phrase[1] for their cryptocurrency wallet leading to the theft of their funds, which were subsequently laundered into the **SUBJECT ADDRESS**, which is defined in paragraph 4 below. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that unknown subjects have violated 18 U.S.C. §§ 1343 and 1349 (wire fraud and conspiracy to commit wire fraud) and laundered the proceeds of that specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C. § 1956(h) (concealment money laundering and conspiracy to commit money laundering). There is also probable cause to believe that the **SUBJECT ADDRESS** received the proceeds of the wire fraud scheme described below and that the **SUBJECT FUNDS** are subject to forfeiture

[1] A seed phrase is a sequence of randomly generated words that serves as the master key to a cryptocurrency wallet. Anyone with access to a wallet's seed phrase can move the cryptocurrency contained in the wallet.

pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). Moreover, there is probable cause to believe that the **SUBJECT FUNDS** are subject to forfeiture as property involved in money laundering offenses, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1).

## PROPERTY TO BE SEIZED

4. I make this affidavit in support of an application for a seizure warrant for the equivalent amount of USDT tokens (the "**SUBJECT FUNDS**") as associated with cryptocurrency wallet address (the "**SUBJECT ADDRESS**"): TPSBjNALXvg7S47VNP4Pp9JkuqDABb2BDT. The particular items to be seized are described in the following paragraphs and in Attachment A.

## APPLICABLE LAW

### A. Criminal Statutes

5. Wire fraud: 18 U.S.C. § 1343 makes it a crime for anyone, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

6. Wire fraud conspiracy: 18 U.S.C. § 1349 punishes any attempt or conspiracy to violate, inter alia, 18 U.S.C. § 1343.

7. Concealment money laundering: 18 U.S.C. § 1956(a)(1)(B)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

8. Conspiracy to commit money laundering: 18 U.S.C. § 1956(h) criminalizes a conspiracy to violate 18 U.S.C. §§ 1956 or 1957.

**B. <u>Seizure and Forfeiture Authority</u>**

9. 18 U.S.C. § 981(a)(1)(C) provides for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting a specified unlawful activity ("SUA"), as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such SUA. 18 U.S.C. § 1956(c)(7)(A) provides that any act or activity constituting an offense under 18 U.S.C. § 1961(1) constitutes an SUA, with the exception of an act indictable under subchapter II of Chapter 53 of Title 31 of the U.S. Code. 18 U.S.C. § 1961(1) references violations of 18 U.S.C. § 1343. Therefore, any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud or wire fraud conspiracy is subject to forfeiture.

10. 28 U.S.C. § 2461(c) (civil to criminal forfeiture incorporation statute) provides that if a person is charged in a criminal case with a violation for which the civil or criminal forfeiture of property is authorized, the government may include notice of the forfeiture in the charging instrument pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to forfeiture, the Court shall order forfeiture of the property as part of the defendant's sentence. The procedures of 21 U.S.C. § 853 shall apply to all stages of a criminal forfeiture proceeding, except for subsection (d) of that statute.

11. Pursuant to 18 U.S.C. §§ 982(a)(1) and 981(a)(1)(A), any property, real or personal, which was "involved in" a violation of 18 U.S.C. § 1956, is subject to criminal and civil forfeiture. Forfeiture aims to remove the profit from crime, by separating criminal actors from their dishonest gains, and divesting criminals from the apparatus allowing them to engage in illicit activity. *See Kaley v. United States*, 571 U.S. 320, 323 (2014). To that end, the forfeiture authority for money

laundering is broader than just the proceeds of the crime, and can include untainted funds commingled with tainted funds. *See* 18 U.S.C. §§ 981(a)(1)(A), 982(a)(1); *United States v. Kivanc*, 714 F.3d 782, 794-95 (4th Cir. 2013) (property involved in a money laundering offense is forfeitable in its entirety); *United States v. Lazarenko*, 564 F.3d 1026, 1035 (9th Cir. 2009) ("[I]n a money laundering charge, the commingling of tainted money with clean money taints the entire account. The money transferred from a commingled account does not need to be traceable to fraud, theft, or any wrongdoing at all. It is enough that the money, even if innocently obtained, was commingled in an account with money that was obtained illegally.").

12. Section 981(b) (civil seizures) provides that, "[n]otwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under [28 U.S.C. § 1355(b)] and may be executed in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement." 18 U.S.C. § 981(b)(3). Pursuant to 28 U.S.C. § 1355(b), a forfeiture action may be brought in any district court where any of the acts giving rise to the forfeiture occurred, even as to property located outside the district.

13. 21 U.S.C. § 853(f) provides that the government may request a seizure warrant authorizing the seizure of property subject to forfeiture in the same manner as for a search warrant. The seizure warrant issues if the Court determines that there is probable cause to believe that the property seized would, in the event of conviction, be subject to forfeiture and that a restraining order may not be sufficient to assure the availability of such property for forfeiture.

14. A restraining order may not be sufficient to preserve the cryptocurrency for forfeiture. Cryptocurrency can be transferred faster than traditional fiat currency held at a bank,

and once transferred, generally cannot be recalled to an original wallet. Moreover, there is a risk that the funds may be moved to a location where no forfeiture or seizure would be possible, at which point the funds could be further laundered into a "privacy" (i.e., untraceable) cryptocurrency. Thus, a seizure warrant is the only means to reasonably assure the availability of the funds in the **SUBJECT ADDRESS** for forfeiture.

**BACKGROUND REGARDING VIRTUAL CURRENCY**

15. **Virtual Currency:** Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

16. **Virtual Currency Address:** A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

17. **Virtual Currency Wallet**: A virtual currency wallet is a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys. Multiple addresses can be stored in a wallet.

18. **Virtual Currency Exchange:** A virtual currency exchange ("VCE"), also called a cryptocurrency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

19. **Blockchain:** Many virtual currencies publicly record their transactions on what is referred to as the "blockchain." The blockchain is essentially a distributed public ledger, run by a decentralized network, containing an immutable and historical record of every transaction that has ever occurred utilizing that blockchain's specific technology. The blockchain can be updated multiple times per hour and records every virtual currency address that ever received that virtual currency. It also maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

20. **Blockchain Analysis:** Although the identity of an address owner is generally anonymous (unless the owner opts to make the information publicly available), analysis of the blockchain can often be used to identify the owner of a particular address. The analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity. A user of virtual currency can utilize multiple addresses at any given time and there is no limit to the number of addresses any one user can utilize.

21. **Transaction Fee**: A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (e.g., Bitcoin on the Bitcoin blockchain). On the Tron network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Tronx ("Tron"). These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

22. **Stablecoins:** Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

23. **Tether (USDT):** Tether International S.A. de C.V. ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

24. **Blockchain Bridge:** A bridge protocol, also known as a cross-chain bridge, is a software application that enables the direct transfer of assets/value across different blockchains (e.g., from the Ethereum network to the Tron network). When a bridge protocol user initiates a transaction from one blockchain to another, the user specifies the number of coins or tokens (i.e., the value) that the user would like to send from the originating blockchain to the destination blockchain.

25. The cryptocurrency ecosystem is used by criminals not only to receive victim money, but to launder it quickly, anonymously, and at scale. Like traditional money laundering, laundering money through cryptocurrency shares the same three stages of placement, layering, and integration, with different techniques applied within each:

a. **Placement –** Criminals use non-custodial, or "private" wallets to initially receive victim funds. This is because such wallets are unattributable to law enforcement by blockchain analysis alone, are simple to create, and can accept large transaction amounts without additional scrutiny.

b. **Layering –** Next, criminals will have victim funds transverse numerous private wallets, consolidate with other illegitimate and sometimes legitimate funds, and be subjected to other more cryptocurrency-specific processes to obfuscate both the origin of, and the ultimate destination for, the victim funds.

c. **Integration –** Finally, by using a diffuse network of "brokers," who agree to exchange cryptocurrency for fiat using various means, criminals render their proceeds liquid and fully integrated with the legitimate financial system.

**PROBABLE CAUSE FOR SEIZURE OF TARGET PROPERTY**

26. The subjects of this investigation have impersonated specific U.S. government employees by the names of D.S. and T.D.

27. The subjects also have utilized the name J.C. purporting to be an employee of U.S. Customs and Border Protection (CBP).

28. On or about March 19, 2026, VICTIM, a 50-year-old male from Broadlands, Virginia in Loudoun County received three telephone calls on his cell phone from telephone number 202-327-1640. VICTIM answered the third call from telephone number 202-327-1640. The caller from telephone number 202-327-1640 identified himself to VICTIM as Officer J.C. of CBP with badge #115202. J.C. advised VICTIM that CBP intercepted a package he sent from Washington, District of Columbia, via United States Postal Service (tracking # EC686990857US) to LE MINH TAI (TAI) in Vietnam that contained two pairs of jeans, three SIM cards and six bank cards. J.C. informed VICTIM that the package was flagged because it contained prohibited SIM cards; therefore, a warrant had been issued for VICTIM's arrest. VICTIM denied any knowledge of TAI and/or sending a package to Vietnam. J.C. then suggested that VICTIM's identity may have been stolen and used to send the package to TAI. J.C. then provided VICTIM with his correct date of birth, address and cell phone number, which convinced VICTIM that someone had stolen his identity. J.C. advised VICTIM that he needed to speak to the FBI about identity theft. J.C. provided VICTIM with case # DC20260045 and advised VICTIM to reference the case when speaking to the agent from the FBI. J.C. then purported to transfer the call to the FBI.

29. After the call was transferred, D.S. introduced himself to VICTIM as an agent with the FBI. VICTIM provided case # DC20260045 to D.S. and provided details of the case shared by J.C. with VICTIM to D.S. D.S. then placed VICTIM on hold and VICTIM overheard D.S. confirm with another agent that a pending investigation existed on VICTIM. D.S. then informed VICTIM that the case is a top-secret international money laundering investigation, and they needed to further discuss the matter on a secure line using Microsoft Teams. VICTIM initially did not have Microsoft Teams on his cell phone; therefore, VICTIM had to install Microsoft Teams on his

cellular telephone to engage with D.S. on a secure line. The first Microsoft Teams communication between VICTIM and D.S. was a video call. D.S. instructed VICTIM to move to a secure location and to make sure no one was around because the information to be discussed was confidential. After VICTIM moved to a secure location, D.S. informed VICTIM that he had been investigating a confidential money laundering case for months and an arrest warrant had been issued for VICTIM. D.S. further advised VICTIM that he had been linked to A.F. who had been recently arrested for money laundering through 108 bank accounts. D.S. then stated because one of the 108 bank accounts used by A.F. to launder $1,800,000 was allegedly opened in Washington, District of Columbia on 01/06/2026 under VICTIM's name, VICTIM had been officially placed under criminal investigation by the FBI.

30. VICTIM tried to explain his innocence to D.S.; however, D.S. advised VICTIM that he must assist the FBI with recovering the funds in the account opened in his name. D.S. also advised that VICTIM would be subject to a strict confidentiality agreement to not disclose any details of the investigation to anyone to include VICTIM's wife to avoid compromising the investigation. VICTIM agreed to assist D.S. out of fear of being arrested for money laundering. D.S. then advised that under the confidentiality agreement, VICTIM needed to provide a "safety report" throughout the day and have a Microsoft Teams audio call connected to D.S. from morning through bedtime to clear his name from the money laundering investigation. The "safety report" required VICTIM to provide D.S. initially with a photograph of the area in which VICTIM was located and note the date and time every two hours throughout the day via Microsoft Teams. D.S. also advised VICTIM that if he did not follow the confidentiality agreement, the FBI would have the local police immediately arrest him. VICTIM followed the confidentiality agreement for the next few days as instructed by D.S.

31. On or about March 21, 2026, D.S. informed VICTIM that he believed VICTIM was innocent of any criminal activities and D.S. was going to speak to the prosecutor and coordinate bail for VICTIM. D.S. then coordinated and connected a three-way Microsoft Team video call with T.D.

32. T.D. introduced himself to VICTIM and stated that he was a prosecutor from the DOJ. T.D. then stated that VICTIM had been charged with money laundering, and a warrant had been issued for VICTIM's arrest. T.D. then became upset with D.S. for discussing the investigation with VICTIM due to the sensitivity of the matter. T.D. ordered D.S. to cease discussing the investigation with VICTIM and left the Microsoft Teams video call. D.S. then advised VICTIM not to worry because he believed VICTIM was innocent and D.S. would explain VICTIM's situation and discuss bail pending trial with T.D.

33. D.S., T.D. and VICTIM engaged in another three-way Microsoft Teams call. At this time, D.S. advised VICTIM that T.D. would take over the matter and D.S. dropped off the Microsoft Teams call. T.D. advised VICTIM that he had reviewed the case and agreed to assist VICTIM with bail if VICTIM agreed to maintain the confidentiality agreement and not disclose any details of the investigation to anyone. VICTIM agreed to maintain the confidentiality agreement with T.D. T.D. then provided a copy of an arrest warrant for VICTIM via Microsoft Teams. T.D. advised VICTIM that if he did not want to be arrested, VICTIM would have to provide funds for bail. T.D. did not know the bail amount until T.D. spoke to the magistrate judge. T.D. then inquired about VICTIM's financial assets and stated the government would freeze all his financial accounts if VICTIM did not fully comply with T.D. VICTIM then provided all his financial information/statements for his accounts to include 401K, Individual Retirement Account

(IRA) and banking accounts at Fidelity, Wells Fargo, Digital Federal Credit Union, PenFed Credit Union and Capital One.

34. T.D. initially advised VICTIM that the bail amount was $160,000; however, T.D. then advised VICTIM that he would talk to the magistrate judge to lower the bail to $110,000. T.D. sent a document via Microsoft Teams to VICTIM noting the bail had been set by the magistrate judge at $110,000. T.D. then instructed VICTIM to provide funds for his bail by transferring funds via wire and cryptocurrency. VICTIM only made one traditional bank transfer of funds at T.D.'s direction. According to T.D., VICTIM had to provide the money via cryptocurrency to minimize tracking due to the confidentiality of the investigation. After T.D. asked VICTIM if he could transfer cryptocurrency, VICTIM stated that he had a Coinbase account to transfer cryptocurrency and began to transfer funds to T.D. for the purported $110,000 bail.

35. T.D. then advised VICTIM that the magistrate judge increased the bail amount to $250,000 because the magistrate judge believed the initial bail amount of $110,000 was too low for money laundering charges; therefore, VICTIM continued to provide funds to T.D. to cover the higher bail amount.

36. Then, after VICTIM provided T.D. with $250,000, T.D. advised VICTIM that he needed to provide additional funds to demonstrate that he had financial capability on numerous occasions and his funds were not laundered through A.F. VICTIM then transferred all the funds from his 401K, IRA, and bank accounts to Wells Fargo, and then to Coinbase, before transferring the cryptocurrency to T.D.

37. Ultimately, at T.D.'s direction, VICTIM made 17 transfers of cryptocurrency, totaling $735,800 from his Coinbase account to three wallets between March 24, 2026 and May 15, 2026.

### a. Summary of Cryptocurrency Transfers (all in USDT)

**Transaction #1**

Date: 03/24/2026

Amount: $300

Recipient's wallet address: 0xD2AE72E492b53177A06966640F5fd49E20fA944D

**Transaction #2**

Date: 03/24/2026

Amount: $84,700

Recipient's wallet address: 0xD2AE72E492b53177A06966640F5fd49E20fA944D

**Transaction #3**

Date: 03/30/2026

Amount: $200

Recipient's wallet address: 0x4bF98DC8Bb9956CDECf9128456e9933ed9C33A8b

**Transaction #4**

Date: 03/30/2026

Amount: $44,300

Recipient's wallet address: 0x4bF98DC8Bb9956CDECf9128456e9933ed9C33A8b

**Transaction #5**

Date: 04/02/2026

Amount: $500

Recipient's wallet address: 0xD2AE72E492b53177A06966640F5fd49E20fA944D

**Transaction #6**

Date: 04/02/2026

Amount: $94,000

Recipient's wallet address: 0xD2AE72E492b53177A06966640F5fd49E20fA944D

**Transaction #7**

Date: 04/02/2026

Amount: $1,000

Recipient's wallet address: 0xD2AE72E492b53177A06966640F5fd49E20fA944D

**Transaction #8**

Date: 04/08/2026

Amount: $200

Recipient's wallet address: 0xD2AE72E492b53177A06966640F5fd49E20fA944D

**Transaction #9**

Date: 04/08/2026

Amount: $133,800

Recipient's wallet address: 0xD2AE72E492b53177A06966640F5fd49E20fA944D

**Transaction #10**

Date: 04/10/2026

Amount: $200

Recipient's wallet address: 0xD2AE72E492b53177A06966640F5fd49E20fA944D

**Transaction #11**

Date: 04/10/2026

Amount: $199,800

Recipient's wallet address: 0xD2AE72E492b53177A06966640F5fd49E20fA944D

**Transaction #12**

Date: 04/22/2026

Amount: $800

Recipient's wallet address: 0xD2AE72E492b53177A06966640F5fd49E20fA944D

**Transaction #13**

Date: 04/22/2026

Amount: $116,000

Recipient's wallet address: 0xD2AE72E492b53177A06966640F5fd49E20fA944D

**Transaction #14**

Date: 05/15/2026

Amount: $500

Recipient's wallet address: 0x5F45939F5343d25497FEA5bD300130e0d4A37cB2

**Transaction #15**

Date: 05/15/2026

Amount: $39,500

Recipient's wallet address: 0x5F45939F5343d25497FEA5bD300130e0d4A37cB2

**Transaction #16**

Date: 05/15/2026

Amount: $500

Recipient's wallet address: 0xD2AE72E492b53177A06966640F5fd49E20fA944D

**Transaction #17**

Date: 05/15/2026

Amount: $19,500

Recipient's wallet address: 0xD2AE72E492b53177A06966640F5fd49E20fA944D

38. T.D. made VICTIM continue with the "safety report" every four hours from March 2026 through May 2026. T.D. also advised VICTIM that he could travel within in the United States if he abided by the confidentiality agreement and informed T.D.; however, if VICTIM attempted to travel outside of the United States, VICTIM would be arrested at the airport.

39. After VICTIM provided the $735,800 in cryptocurrency to T.D., T.D. advised VICTIM that he would call him on May 18, 2026, to set the trial date with the magistrate judge. T.D. informed VICTIM that the trial would be conducted remotely, and, after the trial, all charges against VICTIM would be dismissed and all funds provided to T.D. would be returned to VICTIM.

40. On or about May 18, 2026, the Microsoft Teams connection with T.D. went off-line and VICTIM lost contact with T.D. At this moment, VICTIM realized that he had been scammed by J.C., D.S., and T.D. The next day, VICTIM filed reports with the Loudoun County Sheriff's Office and the FBI.

41. On May 29, 2026, VICTIM was interviewed by an FBI Special Agent. VICTIM also provided the FBI Special Agent with supporting documentation confirming the aforementioned cryptocurrency transactions. VICTIM also confirmed that, to date, no funds had been returned to him.

**b. Summary of the post-theft movement of funds**

42. The following is a description of the flow of funds that are traceable to VICTIM at the **SUBJECT ADDRESS**. All dates and times are in Eastern Standard Time (EST), and the approximate value of each transaction of Tether (USDT) is the equivalent in U.S. Dollars.

43. As described above, as a result of the scam, over the course of at least 17 transfers, VICTIM transferred cryptocurrency to three different cryptocurrency addresses, 0x4bF98DC8Bb9956CDECf9128456e9933ed9C33A8b (0x4b) 0xd2ae72e492b53177a06966640f5fd49e20fa944d (0xd2) and 0x5f45939f5343d25497fea5bd300130e0d4a37cb2 (0x5f).

44. On or about May 15, 2026, at around 1:18 PM, VICTIM transferred approximately 500.142541 USDT to 0x5f. About five minutes later, at around 1:23 PM VICTIM transferred an additional 39,510.075069 USDT to 0x5f.

45. Before the two transactions above, 0x5f had never conducted a cryptocurrency transaction and held no balance of USDT. Following the above-described transfers, 0x5f held a balance of approximately 40,010.21761 USDT.

46. Again, minutes later, at around 1:27 PM 0x5f withdrew 40,010 USDT and sent it to 0xb685760ebd368a891f27ae547391f4e2a289895b, an address associated with a bridging service named Bridgers.

47. A review of the open source blockchain explorer associated with Bridgers shows that, because of the above-described transaction, the USDT sent to Bridgers was bridged from the Ethereum network to the Tron network, resulting in approximately 39,888.47 USDT (less the 121.53 USDT fee for the service) transferred to TKYGKTTegxgXvavHKg7uY8izQgPkSDxHS6 (TKYG).

48. Prior to this deposit, TKYG held a balance of approximately 0.837797 USDT. As a result of the deposit, this balance rose to approximately 39,889.307797 USDT.

49. Two minutes later, at around 1:32 PM, TKYG transferred 39,889 USDT to TPSBjNALXvg7S47VNP4Pp9JkuqDABb2BDT (**SUBJECT ADDRESS**).

50. Prior to this transfer, the **SUBJECT ADDRESS** held a balance of approximately 4,560.447895 USDT. Upon deposit, the balance of the **SUBJECT ADDRESS** rose to approximately 44,449.447895 USDT.

51. A visual depiction of these transfers can be seen below:




52. The government has employed the lowest intermediate balance rule ("LIBR") in analyzing the cryptocurrency in the **SUBJECT ADDRESS**, which is a method of tracing criminal proceeds. Under the LIBR, when criminal proceeds are commingled with other funds in an account, there is a presumption that the other funds are withdrawn first, leaving the criminal proceeds in the account. Under the presumption, criminal proceeds remain in the account as long as the account balance is equal to or greater than the amount of criminal proceeds deposited. *See Sony Corp. of Am. v. Bank One, W. Virginia, Huntington, NA*, 85 F. 3d 131, 138 (4th Cir. 1996). However, that does not mean that the LIBR requires that the proceeds are always spent last. *See United States v. Miller*, 911 F.3d 229, 234 (4th Cir. 2018). "In other words, the LIBR circumscribes what can be traced into an account, rather than out of it." *Id.* at 235. The Fourth Circuit described the LIBR in *Miller* as follows:

> The LIBR provides that where the balance of an account into which tainted proceeds are deposited subsequently dips below the amount of those tainted proceeds, the only tainted funds thereafter traceable to the account are funds equal to that lowest account balance. This is true even if the account balance later grows through the deposit of legitimate funds. Assume, for example, that a money launderer deposits $50,000 of laundered proceeds into an account with a balance of $100,000, yielding a new balance of $150,000. The launderer then spends $120,000 and buys, inter alia, a $20,000 car, leaving the account with only a $30,000 balance. The LIBR precludes ascribing more than $30,000 in laundered proceeds to that bank account thereafter, even if the balance of the account subsequently rises above $50,000 through the deposit of legitimate proceeds. However, it permits tracing $20,000 to the car that the money launderer purchased with tainted funds.
>
> *Id.* at 234.

53. Following the above-described deposit of 39,889.307797 USDT to the **SUBJECT ADDRESS** on or about May 15, 2026, the **SUBJECT ADDRESS** continued to conduct transactions.

54. Between on or about May 15, 2026, and on or about May 22, 2026, the **SUBJECT ADDRESS** conducted a total of 16 additional transactions, including two deposits totaling approximately 99,251.16 USDT, and 14 withdrawals totaling approximately 74,537.30 USDT, leaving the **SUBJECT ADDRESS** with a balance of approximately 69,163.308448 USDT on or about May 22, 2026.

55. A LIBR analysis of the **SUBJECT ADDRESS** shows that, of the approximately 69,163.308448 USDT held in the **SUBJECT ADDRESS** on or about May 22, 2026, approximately 31,929.45 USDT is directly traceable to VICTIM. A table of the LIBR analysis is below, with the deposit of VICTIM's funds highlighted in yellow:

| Timestamp (UTC) | Address | Direction | Amount USD | Amount | BALANCE | LIBR |
|---|---|---|---|---|---|---|
| 5/15/2026 12:52 | TQvSZo79SVBCSqdrdXwoqSAhyPLfvNB9vQ | OUT | $7,832.51 | (7,837.00) | 4,560.45 | 0 |

| Timestamp (UTC) | Address | Direction | Amount USD | Amount | BALANCE | LIBR |
|---|---|---|---|---|---|---|
| 5/15/2026 13:32 | TKYGKTTegxgXvavHKg7uY8izQgPkSDxHS6 | IN | $39,866.16 | 39,889.00 | 44,449.45 | 39,889.00 |
| 5/17/2026 10:44 | TQvSZo79SVBCSqdrdXwoqSAhyPLfvNB9vQ | OUT | $12,513.42 | (12,520.00) | 31,929.45 | 31,929.45 |
| 5/18/2026 9:26 | TQqpt9ewgTkoVPZeTDCMQXgHiy9AU3PGLB | IN | $55,277.75 | 55,317.16 | 87,246.61 | 31,929.45 |
| 5/19/2026 8:25 | TQhYR67KKitr9maCjHsJjSb43XM8EQTCU8 | OUT | $7,249.29 | (7,256.00) | 79,990.61 | 31,929.45 |
| 5/19/2026 8:26 | TL9gjDenhcUug4xtRFVLDaGvLcbMozwxoL | OUT | $3,139.10 | (3,142.00) | 76,848.61 | 31,929.45 |
| 5/19/2026 15:44 | TDNrt8PbE1ii9MBtuw6PMY6Q58iQj9dBWd | OUT | $ 1,444.66 | (1,446.00) | 75,402.61 | 31,929.45 |
| 5/19/2026 15:44 | TDwWPTA5ykFvdMpZFhSeZbea5BZDgPp6TC | OUT | $394.63 | (395.00) | 75,007.61 | 31,929.45 |
| 5/19/2026 15:49 | THarwPfKm845E2tsA5TKxad2Yy2mWUgfFn | OUT | $21.98 | (22.00) | 74,985.61 | 31,929.45 |
| 5/20/2026 9:20 | TQqpt9ewgTkoVPZeTDCMQXgHiy9AU3PGLB | IN | $43,891.20 | 43,934.00 | 118,919.61 | 31,929.45 |
| 5/20/2026 9:45 | TJ5qkBQwDG4pCkev2DzPvUx3E4yxpum9oF | OUT | $1,948.10 | (1,950.00) | 116,969.61 | 31,929.45 |
| 5/20/2026 10:06 | TG8XHoH9CEFXmr2ff1uiQa32ZufPgYJLr2 | OUT | $4,153.95 | (4,158.00) | 112,811.61 | 31,929.45 |
| 5/20/2026 10:07 | TDii6vao7xyWg2rKPbCPWVRpSmne8xcqYx | OUT | $38.26 | (38.30) | 112,773.31 | 31,929.45 |
| 5/20/2026 13:01 | TY73gCGeJ4yZwPew3xLN4xPEkzCGNZjxp1 | OUT | $7,110.07 | (7,117.00) | 105,656.31 | 31,929.45 |
| 5/21/2026 9:45 | TL9gjDenhcUug4xtRFVLDaGvLcbMozwxoL | OUT | $3,148.90 | (3,152.00) | 102,504.31 | 31,929.45 |
| 5/21/2026 20:19 | TPkiVDwUmLmZfXh6kpzgVXaRBtzTzLAn6E | OUT | $6,993.12 | (7,000.00) | 95,504.31 | 31,929.45 |
| 5/22/2026 8:10 | TPJWsHx62xzu6nnqSyMUXWBtNCGwTB7EMF | OUT | $24,083.05 | (24,111.00) | 71,393.31 | 31,929.45 |
| 5/22/2026 10:12 | TBMhf7oFwvrrFCnHtpsATaPYJFQoVn5aae | OUT | $2,227.42 | (2,230.00) | 69,163.31 | 31,929.45 |

56. Based on my training and experience, my knowledge of cryptocurrency, and consultation with subject-matter experts, I know the above flow of funds is indicative of money laundering using cryptocurrency. At each stage above, various methods commonly used by individuals

laundering money were used to thwart law enforcement's ability to trace, and ultimately recover, any illicit proceeds. Those methods include:

a. **Use of Unattributable "0-Level" Initial Deposit Addresses (e.g., 0x5f)**. 0-Level addresses, a term used to describe the virtual currency addresses that scammers direct victims to use for their "investments" or "payments" deposits, are regularly used for individual victims in various forms of cryptocurrency frauds. Because these addresses are not utilized by multiple victims, it is difficult for the victims, or the cryptocurrency services providers that the victims are using, to identify these addresses as related to a scam. This method reduces the exposure of the scammers to interception by law enforcement.

b. **Use of Centralized and/or Decentralized Exchanges (DEX)**. These exchanges, whether centralized, such as Binance, or decentralized, such as Bridgers, allow users to quickly swap one cryptocurrency type for another. This swapping is usually done for one of two reasons: a) to swap to a more desirable cryptocurrency, or b) to break the transaction chain and make further tracing more difficult.

c. **Swapping for Stablecoins, Especially USDT**. Scammers involved in laundering victims' funds held in the form of cryptocurrency regularly exchange or swap the non-stablecoin cryptocurrencies that victims send for stablecoins, specifically USDT. Based on my experience investigating scams involving cryptocurrency, money launderers are particularly drawn to USDT because of its low transaction fees and stability compared to

other more volatile cryptocurrencies. Additionally, USDT is compatible with several different blockchains, which makes it easier to move funds across blockchains to further obfuscate the nature, source, control, and/or ownership of criminal proceeds.

d. **Bridging to the Tron Blockchain**. The infrastructure used by many money laundering networks exists on multiple blockchains. Scammers and money launderers often prefer the Tron blockchain due to the comparatively low transaction fees and widespread infrastructure, which enable bad actors to quickly and effectively launder and cash out proceeds obtained from illicit acts. This pattern has become so common that many U.S. based cryptocurrency exchanges, such as Coinbase, have blocked their users from directly sending funds to addresses on the Tron blockchain. As a result, scammers often are forced to accept funds on other blockchains, such as Ethereum and Bitcoin, or in this case, Ripple, before bridging (also known as Chain Hopping) to the Tron blockchain, where the funds can be put into the larger and well-established money laundering ecosystem that exists on Tron.

57. Within just ten minutes, from 1:23 PM to 1:32 PM, all of the above laundering methodologies were employed by the scammers.

58. Based on my training and experience, I know there is no reason, economic or otherwise, for legitimate businesses or individuals to conduct cryptocurrency transfers using these methods. Whether transferring ETH, BTC or USDT, each individual cryptocurrency transfer costs money. For USDT, that cost comes through the payment of transactions fees, or "gas" fees, required by

the Tron blockchain. It is reasonable to assume that businesses and individuals would strive to minimize those fees by conducting transfers with as few transactions, or "hops," as possible. Furthermore, each transaction delays the whole process, defeating one of cryptocurrency's key attributes—the speed of exchange.

59. I also know that most legitimate businesses, trying to minimize costs and unconcerned with obfuscating the source of funds, prefer using "retail" exchanges. Retail exchanges, like Coinbase or Crypto.com, can consolidate transactions, resulting in lower fees for customers. Criminals laundering through cryptocurrency, however, often avoid these retail exchanges as much as possible, unless using them quickly to swap and/or bridge their cryptocurrency, since they are readily identifiable on blockchain analysis tools, often require that customers provide Know-Your-Customer (KYC) information and are often responsive to legal process.

60. Based on this evidence, I believe that unknown subject(s) orchestrated a criminal fraud scheme against VICTIM and then laundered their funds into the **SUBJECT ADDRESS**.

## FREEZING OF THE SUBJECT ADDRESS

61. On or about May 22, 2026, FBI Washington Field Office sent a Freeze Request to Tether, requesting that Tether freeze the **SUBJECT ADDRESS**. Tether responded acknowledging receipt of the request, and on the same date, confirmed that Tether agreed to voluntarily freeze the **SUBJECT ADDRESS**.

62. The following day, on or about May 23, 2026, Tether confirmed that the freeze of the **SUBJECT ADDRESS** had been put into place, and that approximately 69,163.308448 USDT was frozen within the **SUBJECT ADDRESS**.

## SEIZURE PROCEDURE FOR THE TARGET PROPERTY

63. The foregoing establishes probable cause to believe that the funds held in the **SUBJECT ADDRESS** are subject to civil and criminal forfeiture, because they constitute wire fraud proceeds and property involved in money laundering.

64. Should this seizure warrant be granted, law enforcement intends to work with Tether to seize the funds associated with the **SUBJECT ADDRESS**. In sum, the accompanying warrant would be transmitted to Tether, at which time Tether would "burn" (i.e., destroy) the USDT associated with the address at issue. Tether would then reissue the equivalent amount of USDT tokens associated with the **SUBJECT ADDRESS** and transfer that equivalent amount of USDT to a government-controlled wallet. The seized currency will remain in the custody of the U.S. government during the entire pendency of the forfeiture proceedings, to ensure that access to, or manipulation of, the forfeitable property cannot be made absent court order or, if forfeited to the United States, without prior consultation by the United States.

## CONCLUSION

65. Based on the foregoing, there is probable cause to conclude that the **SUBJECT ADDRESS** received the proceeds of a wire fraud and money laundering scheme, violations of 18 U.S.C. §§ 1343, 1349 (wire fraud and conspiracy to commit wire fraud), and 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C. § 1956(h) (money laundering). Those proceeds are subject to forfeiture as proceeds of wire fraud and wire fraud conspiracy, pursuant to 18 U.S.C. § 981(a)(1)(C) and that same statute as incorporated by 28 U.S.C. § 2461(c), and as property involved in money laundering offenses and a money laundering conspiracy, pursuant to 18 U.S.C. §§ 981(a)(1)(A), 982(a)(1).

66. Accordingly, I respectfully request that a warrant be issued authorizing the seizure the equivalent amount of Tether ("USDT") held in the **SUBJECT ADDRESS**. Because the warrant will be served on Tether, who will then collect the funds at a time convenient to it and transfer the funds to the government, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Ronald E. Miller
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on July 29, 2026.

HONORABLE WILLIAM B. PORTER
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A: PROPERTY TO BE SEIZED

Pursuant to this warrant, Tether International S.A. de C.V. ("Tether") shall provide the law enforcement officer/agency serving this document with the equivalent amount of USDT tokens that are currently associated with the virtual currency address referenced below. Tether shall effectuate this process by (1) burning the USDT tokens currently associated with the virtual currency address referenced below and (2) reissuing the equivalent value of USDT tokens to a U.S. law enforcement-controlled virtual currency wallet. Tether shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate its implementation.

a. TPSBjNALXvg7S47VNP4Pp9JkuqDABb2BDT ("**SUBJECT ADDRESS**")